[No. D015478. Fourth Dist., Div. One. May 27, 1993.]

LINDSEY DAVID KENLY, Plaintiff and Respondent, v.
HIROSHI UKEGAWA et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1 this opinion is certified for publication with the exception of part 5.

50

**COUNSEL**

Haskins, Nugent & Newnham and Michael H. Fish for Defendants and Appellants.

Andrews & Riley, Robert D. Andrews, Kelly, Herlihy, & Bane and Andrew N. Chang for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—Plaintiff Lindsey David Kenly (Kenly) sued defendants Hiroshi Ukegawa (Ukegawa), Vista Loma Investments, a California general partnership (Vista Loma), and Ukegawa Brothers, a California general partnership (Ukegawa Brothers) for fraud. Kenly prevailed and recovered an award of $800,000 in compensatory damages and $200,000 in punitive damages.

Defendants do not challenge the liability determination on Kenly's fraud claim, but do contest the propriety of the amount of compensatory damages. Similarly, defendants concede substantial evidence supports a punitive damage award in some amount, but argue the award must be reversed because it is unsupported by any evidence of defendants' net worth. Finally, defendants argue that any award against Ukegawa Brothers, whether compensatory or punitive, is improper. After a brief review of the facts, we will address defendants' claims.

1. *Factual Background*

The lawsuit grew out of an oral offer by Ukegawa to sell a 100-plus-acre farm (the farm) to Kenly and his partner William Johnson (Johnson). In 1988 Ukegawa was a general partner in Vista Loma, which owned the farm. At

that time the property was encumbered by numerous liens, including a first trust deed securing a $412,000 note (the Puckett note), a second and third trust deed totaling approximately $1.55 million, and numerous additional junior liens totaling another approximately $1.27 million.

The Puckett note was in default in August 1988. The foreclosure sale was scheduled for August 16. On August 13 Ukegawa attended the races, where he encountered his friend Johnson. Ukegawa indicated he was willing to sell the land to Johnson for the amounts represented by the first, second and third trust deeds, because Ukegawa was going to lose the property anyway and foreclosure would harm his credit rating, possibly spurring his other creditors to refuse additional credit extensions. Ukegawa stated that Johnson would need to obtain $416,000 before the foreclosure sale in order to pay off the Puckett note. Johnson lacked those funds on such short notice, but suggested to Ukegawa they enlist Kenly, who had ready access to line-of-credit funds. Ukegawa agreed, and the three men (Kenly, Ukegawa and Johnson) met that afternoon and agreed to a deal whereby Kenly and Johnson would purchase the property for approximately $2 million, representing the amounts owed on the first, second and third trust deeds.

The trial court concluded Ukegawa had no intention of performing his promise to sell, but only made such promise to induce Kenly to advance the funds necessary to stave off the impending foreclosure. Kenly in fact borrowed the funds necessary to acquire the Puckett note, and on August 16 used those funds to purchase the Puckett note.

Ukegawa did not immediately renege on his oral agreement to sell the farm, but stalled Kenly for several months with various excuses, the details of which are not germane. In June 1989, however, Kenly learned Ukegawa was trying to sell the property to third parties. Kenly filed a lawsuit. Ukegawa eventually paid Kenly the full amount due on the Puckett note.

## 2. The Trial Court Judgment

The trial court concluded fraud was committed and that Kenly sustained actual damages of $800,000, representing the lost profits Kenly would have obtained had Ukegawa honored the agreement to sell the property to him. The trial court also awarded Kenly $200,000 in punitive damages. Although no evidence was introduced to show the "net worth" of any of the defendants, the trial court concluded $200,000 was reasonable ". . . in light of the evidence of profits to be acquired by the defendants due to their fraudulent conduct that allowed them to resell the property at a profit." This appeal followed.

### 3. *The Trial Court Erred by Granting Compensatory Damages Which Gave Kenly the Benefit of the Bargain*

 The trial court awarded $800,000 as compensatory damages, based on its conclusion that Kenly would have made that amount of profit from a resale of the farm if Ukegawa had honored his promise and sold the farm to him. Ukegawa contends such award was improper. We agree.

In California a defrauded party is ordinarily limited to recovering his "out-of-pocket" loss, i.e., the difference between the value with which he parted and the value he received. (*Christiansen* v. *Roddy* (1986) 186 Cal.App.3d 780, 790 [231 Cal.Rptr. 72].)[2] If this measure applies, Kenly would not be entitled to recover damages measured by the profit he could have reaped had Ukegawa's representation that he would sell the farm been true, but instead would be limited to recovering what he lost through reliance on the false promise.

In some cases, however, lost profits are recoverable. Civil Code[3] section 3343 specifies lost profits can be recovered when a buyer of property is induced by fraudulent representations of the seller concerning the nature of the property. Section 3343, subdivision (a)(4) provides: "Where the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, [the defrauded party can recover] an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided [the defrauded party acquired it for resale, he reasonably relied on the fraud in anticipating profits, and] . . . [a]ny loss of profits . . . have been proximately caused by the fraud and the defrauded party's reliance on it."

Here, we must determine whether "lost profits" can be recovered where the profits were expected from the resale of a piece of property (i.e., the

---

[2] Prior to the enactment of Civil Code section 3343, there was confusion over the proper measure of fraud damages in California. (*Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 759-762 [192 P.2d 935].) The two competing measures of recovery were the "benefit-of-the-bargain" measure and the "out-of-pocket" measure. The benefit-of-the-bargain awards the difference between the actual value of the property received and the value it would have had were it in the state represented. However, under the out-of-pocket approach the defrauded party receives only the difference between the value of the property received and the amount he paid. The adoption of Civil Code section 3343 placed California among the jurisdictions using the out-of-pocket measure. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1441, pp. 914-915.)

[3] All statutory references are to the Civil Code unless otherwise specified.

farm) *never acquired* by the defrauded party. Indisputably, the only property acquired by Kenly was the Puckett note. Based on that acquisition, Kenly claims entitlement to profits he could have made on a different piece of property: the farm.

Kenly cites no California authority which holds lost profits may be awarded to a defrauded party who never acquired the property to be resold. Cases involving fraud where property was not acquired have limited damages to out-of-pocket losses. Thus, in *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763] defendant falsely represented that plaintiff could acquire certain property upon which to expand his business. When plaintiff discovered the representation was false, he sought damages for amounts spent in reliance upon the certainty of sale plus "delay damages." The delay damages arose because the cost to construct the planned improvements increased during the time plaintiff waited for the sale to close. The Supreme Court reversed the delay damage award, stating plaintiff "was entitled only to the 'actual losses suffered because of the misrepresentation.' [Citation.] His inability to begin construction on the property was not caused by [the] misrepresentation, but by the seller's refusal to accept his offer of sale." (*Id.* at p. 504.) *Gray* holds that a defrauded party may recoup his out-of-pocket losses and expenditures in reliance on the fraud, but he may not recover benefit-of-the-bargain damages (i.e., damages placing him in the economic position he would have occupied had the representation been true), at least where the recovery is not premised on a specific property actually acquired by the defrauded party.

Kenly occupies a position analogous to that of the plaintiffs in *Christiansen* v. *Roddy, supra,* 186 Cal.App.3d 780. In *Christiansen* the defendants fraudulently represented that if plaintiffs invested certain funds in a loan secured by collateral they would reap a return of 20 percent. Similarly, Kenly was promised that if he acquired the Puckett note he would profit handsomely from a later purchase and resale of the farm. The *Christiansen* court, though upholding the damage award allowing plaintiffs to recover their invested funds, reversed the award to the extent it gave plaintiffs the 20 percent profit promised them, reasoning: "The proper measure of tort damages is the 'out-of-pocket' measure; successful tort plaintiffs are not entitled to have damages computed on a contract, or 'benefit-of-the-bargain,' theory. [Citations.] [¶] 'A plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done.' [Citation.] Here, 'had the wrong not been done,' i.e., had the misrepresentation not been made, [plaintiffs] would presumably not have made their investments; while it would have been proper to award them [a

return of their investment], . . . it was improper for the court below to put [plaintiffs] in a better position than they would have been had they not been deceived. . . ." (*Id.* at p. 790.)

The same holds true here. If the "wrong" had not been done, Kenly presumably would not have borrowed funds to purchase the note; if he incurred damages from that transaction, he is entitled to be made whole.[4] However, Kenly is not entitled to placement in a better position than he would have occupied absent the fraud.

An examination of the language of section 3343 supports the conclusion that Kenly is not entitled to lost profits on a property he never acquired. Section 3343, subdivision (a)(4) permits a party who is fraudulently induced to "purchase or otherwise acquire the property in question" to realize profits which would have been earned had "the property" possessed the characteristics attributed to it. That language clearly contemplates that the party actually *acquire* the property *in question*, i.e., the property from which profits were to be realized. Here, the property in question was the farm, which was to yield profits. The farm was never acquired. The only property acquired was the note, and the profits awarded were not based on the sale of the note but on the farm to be acquired in the future.

Kenly argues it was proper to award profits because purchase of the note was the first step toward acquiring the farm, from which he expected profits. However, this theory strains section 3343 because it requires us to interpret the multiple references to "property" in section 3343, subdivision (a)(4) as referring to *different* properties, i.e., here the property "acquired" would be the note while the "profitable" property would be the farm. Kenly's theory would expand the "lost profit" component of a fraud award beyond the boundaries contemplated by section 3343. Section 3343, subdivision (a)(4) limits the lost profit component to the property acquired. Kenly's theory, however, is that so long as the defrauded party spent money to acquire *any* property (such as the note) preparatory to acquiring *other* properties, profits on *any* other properties he hoped to acquire are recoverable. This does not accord with the limits in section 3343, subdivision (a)(4).

Kenly's argument that *Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240 [137 Cal.Rptr. 244] supports his claim for lost profits is unavailing. In

---

[4]The evidence indicated Kenly borrowed the amounts needed to purchase the Puckett note and sustained a loss therefrom because he borrowed against his line of credit at a rate fluctuating between 9.5 percent and 12.9 percent, but acquired a note apparently paying only 8 percent.

*Hartman*, the defrauded party *actually acquired* a franchise to operate a gas station at a certain corner. The fraud was the false promise that the property acquired, the franchise, would either be expanded or moved to a more desirable locale. "Lost profits" were recoverable because, had the property been made into a larger and more modern facility, as promised, it would have generated greater profits. *Hartman* is irrelevant because, unlike this case, the property expected to generate profits was actually acquired.

### 4. *The Punitive Damage Award Must Be Reversed Because There Was No Evidence Showing Defendants' Net Worth*

The parties agree there was no evidence of defendants' net worth. The issue is whether punitive damages, which ordinarily rest on a defendant's net worth (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 114 [284 Cal.Rptr. 318, 813 P.2d 1348]), may be awarded solely on the basis of proof of the profit reaped by a defendant as the result of the fraud. Defendants here argue "net worth" is the exclusive "financial component" of the proof required for a punitive damage award.[5] Kenly argues, however, that if the punitive damage award is reasonable in light of the profits defendants gained from the fraud, net worth need not be shown.

Traditionally, "net worth" was the criterion against which an award of punitive damages was measured to decide whether the award was excessive. (*Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262, 1267-1269 [262 Cal.Rptr. 311].) However, in *Cummings Medical Corp.* v. *Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291 [13 Cal.Rptr.2d 585], the court held (apparently for the first time in this state) that a punitive damage award was proper without regard to the defendant's net worth, and that such award could be based solely on the amount of profit defendant garnered from the fraud. (*Id.* at pp. 1300-1301.) Relying on *Cummings*, Kenly argues the evidence showed Ukegawa profited because the fraud allowed him to save the property from foreclosure, and Ukegawa stood to gain over $2 million from a later resale of the property, making a $200,000 punitive damage award well within reason.

---

[5]Three factors are to be evaluated in assessing punitive damages: (1) the reprehensibility of a defendant's conduct; (2) proportionality: whether the amount of the award bears a reasonable relationship to the damage actually suffered by plaintiff; and (3) whether the award is reasonable in light of defendant's financial condition. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) While all three aspects must be considered (*Adams* v. *Murakami, supra*, 54 Cal.3d at p. 111), only the third aspect, which we refer to as the "financial component," is in issue here.

To evaluate this issue, which was specifically left open by the *Adams* court,[6] we begin with the purpose underlying consideration of the financial component: to assure that the award punishes but does not cripple or bankrupt the defendant. (*Dumas* v. *Stocker, supra,* 213 Cal.App.3d at p. 1269.) *Adams* reiterated that, even though a large award might be justified in light of the other two criteria (reprehensibility and proportionality), a large award ". . . can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone.*" (*Adams* v. *Murakami, supra,* 54 Cal.3d at p. 111, italics in original.) For that reason, a defendant's financial status must be shown because the purpose of the award "is to deter, not destroy." (*Id.* at p. 112.)

We are convinced that in most cases there must be evidence of the defendant's net worth in order to support the punitive damage award.[7] An award based solely on the alleged "profit" gained by the defendant, in the absence of evidence of net worth, raises the potential of its crippling or destroying the defendant, focusing as it does solely on the assets side of the balance sheet *without examining the liabilities side of the balance sheet.* Without evidence of the entire financial picture, an award based on "profit" could leave a defendant devoid of assets with which to pay his other liabilities. It is here that we believe the *Cummings* court strayed when it concluded that an award based on the profit reaped from the fraud is proper and can *never* be excessive. (*Cummings Medical Corp.* v. *Occupational Medical Corp., supra,* 10 Cal.App.4th at p. 1300.) *Cummings* concluded a profit-based award could never be excessive in view of the deterrent and punishment functions of such an award, but failed to discuss whether it might be excessive in light of an important criterion: the defendant's "ability to pay." The *Cummings* court, by focusing on "profit" and ignoring the total balance sheet picture, approves an approach which overlooks this crucial aspect of the financial equation.

---

[6] Although the *Adams* opinion is laced with language suggesting net worth is the touchstone for punitive damage awards, the court specifically stated: "Various measures of a defendant's ability to pay a punitive damages award have been suggested. Defendant . . . contends the best measure of his ability to pay is his net worth. . . . [A]micus curiae . . . advocates the profitability of the defendant's misconduct as the proper measure. We decline at present, however, to prescribe any rigid standard for measuring a defendant's ability to pay." (*Adams* v. *Murakami, supra,* 54 Cal.3d, at p. 116, fn. 7.)

[7] We do not hold that an award of punitive damages can *never* be justified solely on the profits of the fraudulent transaction (without evidence of net worth), because there may well be cases where the evidence compels the conclusion the defendant will not be crippled by the award. For example, a $10,000 punitive damage award (based on profits) against a Fortune 500 company might well be proper without a lengthy presentation of the company's net worth. However, the facts presented here cannot assure us the award will not have a crippling effect, and therefore evidence is required on that issue.

In this case, for instance, a conclusion from the evidence that the defendants would profit to the extent of $2 million from their fraud[8] does not necessarily lead to a further conclusion that they would emerge from the transaction with $2 million in available resources. We accept the logic of taxing a fraudulent profiteer to the extent of his ill-gotten gains, assuming he has the ability to pay the award. Lacking ability the purpose of punitive damages is not served when the award is based solely on high paper profit from the fraudulent transaction. We know from the facts of this case that the defendants were in difficult financial straits, juggling balance sheet items in the millions of dollars. Although we may surmise that the defendants' assets were in the millions, we could just as easily assume that their debts were equally high. Without evidence of the actual total financial status of the defendants, it is impossible to say that any specific award of punitive damages is appropriate.

The problems encountered by a punitive damage award based on profit dissolve when a "net worth" standard is employed, because the net worth standard assures the award complies with the "ability to pay" criterion. Moreover, a net worth approach does not ignore the profit aspect of the transaction; any profit would be accounted for as part of the net worth calculation. To the extent the evidence supported a conclusion that defendants' remaining net worth (apart from the fraudulently obtained profit) left them solvent and viable, an award based on profit might have been appropriate. We thus do not hold that profit may not be considered, but only conclude it is error to focus on profit to the exclusion of all other information demonstrating defendants' ability to pay.

### 5. There Is No Substantial Evidence to Support Any Award Against Ukegawa Brothers*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment against Ukegawa Brothers is reversed in its entirety. The damage award against Ukegawa and Vista Loma is reversed for retrial solely

---

[8]While we are willing to assume for purposes of this discussion that the proof does support the conclusion of a substantial profit, we should note that the evidence is far from complete on the subject. The evidence disclosed the price and the preexisting mortgage creditors, but did not indicate the existence or nonexistence of other lien creditors who likely would have to be paid through any sales escrow.

*See footnote, ante, page 49.

on the issues of the proper amounts of compensatory and punitive damages, in light of the views expressed in this opinion. Kenly shall bear costs on appeal.

Kremer, P. J., and Wiener, J., concurred.