[Nos. A079731, A080825. First Dist., Div. Five. Feb. 9, 1999.]

ROBERT L. CLOUD & ASSOCIATES, INC., Cross-complainant and Respondent, v.
WALTER R. MIKESELL, JR., Cross-defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, parts I and III of this opinion are not certified for publication.

**COUNSEL**

Richard L. Mikesell for Cross-defendant and Appellant.

Collins & Beeson and Kendall D. Collins for Cross-complainant and Respondent.

## OPINION

**HANING, J.**—This dispute between a former employee and his former employer raises issues concerning the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.). We conclude the UTSA was improperly applied here and reverse the judgment in part.

### FACTS

Robert L. Cloud & Associates, Inc. (RLCA), is an engineering firm specializing in "pressure vessel" consulting. In 1986, when plaintiff Walter R. Mikesell, Jr., joined RLCA, the firm specialized in assessing the structural adequacy of nuclear power plants. After Mikesell was hired the firm took advantage of his contacts with Chevron, Exxon and other local refineries and branched out to work in the "process industry."

Two years after joining RLCA, Mikesell signed a confidentiality agreement whereby he agreed not to disclose certain information including, among other things, technological information, customer identities and client strategies. The agreement required Mikesell, among other things, to keep confidential and not make use of "Confidential Information" of RLCA or its clients. "Confidential Information" was defined in the contract to include "any and all information concerning teaching techniques, processes, formulas, trade secrets, innovations, inventions, discoveries, improvements, research or development and test results, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, projections, and customer and supplier identities, characteristics, and agreements."

*Russian Business*

In the early 1990's there existed in the former Soviet Union a number of pressure vessel manufacturers that were interested in doing business with American firms, but in order to do so the Russian firms needed accreditation from the American Society of Mechanical Engineers (ASME). That is, the vessels sold had to meet ASME code safety standards. In 1990 RLCA was approached through Chevron by a Russian company (Volgogradneftemash, hereafter VNM) seeking assistance in obtaining ASME accreditation. That initial contact was eventually followed up, albeit reluctantly, by Mikesell.

In 1992 Mikesell, with the aid of an RLCA engineer, Craig Boyak, began devoting his time to developing business for RLCA in Russia. To that end Mikesell rented an apartment/office in St. Petersburg, hired translators, printed marketing brochures (translated into Russian), and developed contacts with potential Russian and American business customers. In addition to promoting RLCA as a provider of accreditation courses, Mikesell began negotiating for RLCA to serve as marketing representative, to prepare proposals for the sale of the Russian firms' vessels to American companies.

The first contract Mikesell secured for RLCA was with VNM for ASME accreditation courses. Pursuant to that contract, Mikesell and Boyak prepared training materials, including course outlines, syllabi, notes, and translated materials. After VNM successfully obtained ASME accreditation, RLCA was approached by other Russian firms. By early June 1994 Mikesell reported success in obtaining agreements with two companies, Atommash and Izhora, for conducting accreditation courses and training, and Mikesell was hopeful that a contract would be obtained with Podolsk. Additionally, Mikesell had entered into a tentative marketing agreement with Atommash and had reached a verbal marketing agreement (sealed with a handshake) with Izhora. Mikesell and Boyak devoted considerable effort toward preparing materials for the accreditation courses, and they did conduct an accreditation course for the Izhora firm.

At the end of June 1994 Mikesell and Boyak left RLCA and started their own company, Mikesell & Boyak Associates (MBA). Upon their departure from RLCA, Mikesell and Boyak paid RLCA for the balance of the lease on the St. Petersburg apartment and reimbursed RLCA for the laptop computer and computer programs that were retained in Russia. RLCA officers believed the computer and programs would be outdated within a few months. To fulfill its verbal agreements with Izhora, Atommash, and Podolsk, RLCA arranged with other consultants to undertake the unfinished work, and RLCA submitted a formal proposal to the Russian clients to that effect.

In the meantime, however, MBA also approached the Russian firms and proposed undertaking the accreditation and training work. MBA sent a letter to VNM suggesting that RLCA would not survive and that the firm should give its business to MBA. MBA also solicited the business of Izhora and Podolsk. By August 1994 MBA had entered into agreements with Izhora, Atommash and other Russian companies to provide ASME accreditation courses. The service agreement used by MBA was identical to the form agreement that was used by RLCA. (However, RLCA's form agreement, in turn, had been copied by Mikesell from his previous employer's form.)

In addition, MBA submitted to Izhora a written marketing agreement in the name of MBA, though the verbal agreement had been with Mikesell on behalf of RLCA. Pursuant to that marketing agreement, MBA subsequently submitted proposals to American buyers for Izhora's vessels. At trial, Mikesell and Boyak claimed that their Russian business proved unprofitable; that they incurred a net loss overall.

*Teaming Agreement*

In the early part of 1994 RLCA, through Mikesell and Boyak, negotiated with Chevron to analyze the reactor vessels of Chevron's Canadian licensee, PetroCanada. When Mikesell and Boyak left RLCA, the RLCA managers believed that the only way to save the Chevron project was to contract with Mikesell and Boyak to have them complete the work. Consequently, on July 12, 1994, RLCA and MBA entered into a "teaming agreement" whereby MBA agreed to assist RLCA in completing the Chevron PetroCanada reactor analysis in return for hourly compensation. The teaming agreement provided, in part: "This work, plus any remaining work on existing Chevron contracts, are the only obligations you have to RLCA with respect to business with [Chevron]. [Both RLCA and MBA] are free to pursue any new scope activities with Chevron . . . ." Soon thereafter, on July 27, RLCA and MBA entered into another teaming agreement to extend MBA's work to four other projects that RLCA had contracted to undertake (Hinshaw, Climaco, Ferro, and the Chevron Kirishi project).

During and after MBA's work under the teaming agreements, MBA was hired directly by some of the contractors to perform additional work. In particular, in August 1994 Mikesell contacted Climaco, for whom Mikesell was serving as an expert witness, to suggest that Climaco terminate its existing contract with RLCA on the ground that it had a personal service agreement with Mikesell. Climaco did so and thereupon paid Mikesell directly. In September 1994 MBA submitted a successful bid to Chevron to perform further work on the PetroCanada reactor, and in 1996 MBA obtained a contract for work with Ferro.

In March 1994 RLCA obtained a contract with Chevron to design computer software for evaluating its Kirishi nuclear reactor and also had an agreement to escort Chevron officials to Russia in pursuit of Russian business. The work on the software design, however, was interrupted by the PetroCanada project. In May 1996 MBA was hired by Chevron to complete the computer software project, and MBA hired a moonlighting RLCA employee to assist in the design work. In October 1996 Chevron paid MBA

for providing support services in escorting Chevron officials to St. Petersburg.

*Lost Course Materials*

Toward the end of August 1994, after Mikesell and Boyak had left RLCA, RLCA asked for the return of the ASME training materials that Mikesell and Boyak had prepared earlier that year. Boyak sent RLCA a computer diskette, but all the course materials had been deleted. About the same time, RLCA engineers discovered that all the ASME code books that had been purchased for the Russian projects were missing. When Tim Hardin, RLCA's executive vice-president, asked Boyak about the code books, Boyak returned two and said the others had been sent to Russia. RLCA made no claim at trial for the missing code books.

In April 1996 RLCA was asked by a Canadian company, Bantrel, Inc., to conduct ASME accreditation courses. However, when RLCA officials went to gather the course materials they found them missing, even from the computer files. As a result, RLCA was unable to undertake the work for Bantrel. MBA, however, did conduct the course for Bantrel.

*Nonpayment*

RLCA refused to pay MBA for its work under the teaming agreements. Instead, RLCA informed MBA that the amounts due under the teaming agreements would be used to offset damages RLCA claimed to have suffered from lost business lured away by Mikesell. Similarly, beginning in December 1994, RLCA stopped paying Mikesell money due him under his deferred compensation plan. Instead, RLCA credited Mikesell for the amount of his deferred compensation payments against what RLCA claimed to be owed to it for lost business.

PROCEDURAL HISTORY

Mikesell and Boyak sued RLCA for breach of contract to recover the amounts due MBA under the teaming agreements and the amounts due Mikesell under his deferred compensation plan. RLCA cross-complained for damages and injunctive relief under various theories, including breach of the confidentiality agreement, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, conversion, unjust enrichment, fraud, misappropriation of trade secrets, and interference with prospective business advantage.

At trial, RLCA valued its losses at $1.5 million, but claimed only $1.3 million in damages, acknowledging an offset due to Mikesell for his deferred

compensation. By special verdict the jury awarded RLCA $232,300. The jury also awarded Mikesell $145,000 for breach of the deferred compensation agreement and awarded MBA $25,792 for breach of the teaming agreements. (The latter award was exactly the amount MBA claimed was due. RLCA had disputed the amounts.)

After the jury was discharged RLCA moved to "enhance" the damage award with an award of punitive damages and attorney fees, plus an order for injunctive relief. The trial court granted the motion and entered an award of $115,250 in punitive damages and an award of $50,764 in attorney fees. The court further ordered Mikesell to pay royalties for 10 years of a percentage of all sales or services to Russian companies. Judgment was entered accordingly. Mikesell's motion for new trial was denied by operation of law. The trial court denied Mikesell's motion to tax costs. Mikesell now appeals from the judgment and from the postjudgment award of costs.

DISCUSSION

I*

*Compensatory Damages*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Remedies Under the UTSA*

The UTSA provides various remedies for the misappropriation of trade secrets, including injunctive relief, damages, royalties, punitive damages and attorney fees.[4] (Civ. Code,[5] §§ 3426.2-3426.4.) During the discussion of jury instructions, counsel for Mikesell invoked the UTSA by asking for an instruction to permit an award of attorney fees pursuant to section 3426.4 based upon a finding that RLCA had brought claims of misappropriation of trade secrets in bad faith. Section 3426.4 authorizes an award of attorney fees to the prevailing party if, inter alia, "a claim of misappropriation is

---

*See footnote 1, *ante* page 1141.

[4] RLCA's cross-complaint did not refer explicitly to the UTSA. However, the cross-complaint did pray for injunctive relief restraining Mikesell and Boyak from "exploit[ing] [RLCA's] customer lists, trade secrets, and proprietary information." Counsel for RLCA alerted the trial court at the beginning of trial that the parties were in dispute over the existence of trade secrets.

[5] Unless otherwise indicated, all further section references are to the Civil Code.

made in bad faith . . . or willful and malicious misappropriation exists . . . ." The instruction was refused.

Subsequently, after the jury returned its verdict and had been discharged, RLCA filed a motion for "enhancement" of the jury's verdict, seeking injunctive relief, punitive damages and attorney fees under the UTSA. The trial court granted the motion and entered an award of punitive damages, royalties and attorney fees.[6] Mikesell challenges the order for payment of royalties and the punitive damage award.

## A. *Royalties*

Subdivision (a) of section 3426.3 provides for damages for the actual loss and for any unjust enrichment caused by the misappropriation of trade secrets. As an alternate remedy, subdivision (b) of section 3426.3 provides for the payment of royalties from future profits "[i]f neither damages nor unjust enrichment caused by misappropriation are provable . . . ." (See generally, *Unilogic, Inc.* v. *Burroughs Corp.* (1992) 10 Cal.App.4th 612, 626 [12 Cal.Rptr.2d 741].)

The trial court enjoined Mikesell and Boyak from using trade secrets and confidential information acquired while employed by RLCA, and further ordered Mikesell and Boyak to pay a royalty on their gross receipts derived from sales or services to seven named Russian firms. The royalties were to be paid for ten years: 10 percent for the first four years, 6 percent for the next three years, and 3 percent for the last three years.

Mikesell contends the trial court erred in ordering the payment of royalties, since damages and unjust enrichment were not only "provable," but were actually proved. We agree. The jury awarded RLCA damages both for its losses and for Mikesell and Boyak's unjust enrichment.[7] The additional award of royalties essentially gives RLCA a double recovery, as the jury's award of $232,300 in damages already compensated RLCA for its lost profits from the Russian business.

In support of the trial court's order, RLCA relies upon another provision of the UTSA, section 3426.2, which authorizes an injunction against actual or threatened misappropriation of a trade secret and, as an alternative to

---

[6]While the awards of punitive damages and royalties were apparently made pursuant to the UTSA, the award of attorney fees was made pursuant to section 1717 in that the confidentiality agreement contained an attorney fee clause.

[7]The jury's award of $232,300 in compensatory damages was based upon findings of among other things, conversion, unjust enrichment, and misappropriation of trade secrets.

enjoining future use of a trade secret, authorizes payment of a royalty. "If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited." (§ 3426.2, subd. (b).) Section 3426.2 has no application here; the payment of a royalty is authorized by that statute when the future use of a trade secret is *not* enjoined. Here, the trial court enjoined Mikesell from using trade secrets in the future and also ordered the payment of royalties. The order for payment of royalties must have been grounded in section 3426.3.

Mikesell argues that section 3426.2 provides only a pretrial remedy, and that once the verdict has been rendered section 3426.3 comes into play. As we read the statutes, however, section 3426.2 authorizes injunctive relief while section 3426.3 authorizes a monetary award. Both statutes provide for the payment of royalties as an alternative remedy—either as an alternative to an injunction against future use (§ 3426.2, subd. (b)) or as an alternative to an award of damages (§ 3426.3, subd. (b)). (See generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, §§ 110-111, pp. 792-793.)

Based upon our reading of the UTSA, we conclude the order for payment of royalties is unauthorized. However, the UTSA does not affect any other civil remedies that may be available. (§ 3426.7.) We therefore examine the order for payment of royalties in light of the general rules on injunctive relief.

■ While a former employee has the right to compete with his former employer, even for the business of those who had been the customers of the former employer, a former employee cannot solicit those customers' new business. (*American Credit Indemnity Co.* v. *Sacks* (1989) 213 Cal.App.3d 622, 633-636 [262 Cal.Rptr. 92].) Acts of solicitation of the former employer's customers and the misuse of confidential information are acts of unfair competition that may be enjoined. (*Southern Cal. Disinfecting Co.* v. *Lomkin* (1960) 183 Cal.App.2d 431, 442-447 [7 Cal.Rptr. 43] (*Southern*); *Alex Foods, Inc.* v. *Metcalfe* (1955) 137 Cal.App.2d 415, 423-424, 427 [290 P.2d 646].)

■ The question before us, then, is whether the trial court's authority to grant injunctive relief extends to the power to order payment of royalties from future business. We conclude it does not. Section 3422 authorizes an injunction to prevent the breach of an obligation (1) where pecuniary compensation would not afford adequate relief or (2) where ascertaining adequate compensation would be extremely difficult. Here, the trial court's

order for payment of royalties purports to compensate RLCA for its loss of future business. Yet, lost future profits are properly an element of a monetary damage award, even though they may not be capable of exact determination. (*Southern, supra,* 183 Cal.App.2d at pp. 449-451.) Here, RLCA's lost future business was included within its claim of damages. In particular, RLCA's expert witness included in his valuation of RLCA's losses $1 million in anticipated commissions under the marketing agreements. In closing argument, counsel for RLCA urged the jury to reject Mikesell's contention that MBA was making no money from the Russian business and to find from the circumstantial evidence that MBA was reaping profits from its marketing agreements. Inasmuch as the jury ascertained RLCA's economic damages based upon the evidence of RLCA's lost business opportunities, we conclude that the order for payment of royalties was an unauthorized double recovery to RLCA.

In light of our conclusion that the trial court's order for payment of royalties was unauthorized, we need not decide whether the Russian business constituted a "trade secret" for purposes of the UTSA. We observe, however, that there was no evidence that RLCA took any means to ensure that the identity of the Russian firms with which Mikesell had contact would be kept secret. In fact, Tim Hardin, RLCA's executive vice-president, conceded in his testimony that the identity of RLCA's Russian clients was not confidential.

### B. *Punitive Damages*

 Mikesell challenges the award of punitive damages by correctly pointing out that there was no evidence of Mikesell's net worth, and an award of punitive damages must be supported by meaningful evidence of the defendant's financial condition. (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 116, 123 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*).) In response, RLCA contends that because the amount of punitive damages allowable under the UTSA is limited to twice the compensatory damages (§ 3426.3, subd. (c))— unlike an ordinary award of punitive damages, which is unlimited—evidence of the defendant's financial condition is less of a concern. This argument is refuted by *Vacco Industries, Inc.* v. *Van Den Berg* (1992) 5 Cal.App.4th 34, 46, footnote 11 [6 Cal.Rptr.2d 602], in which the court held the *Adams* rule applicable to a case in which the remedies of the UTSA were applied.[8]

 In *Adams, supra,* the Supreme Court reasoned that the absence of evidence of the defendant's financial condition frustrates meaningful

---

[8]The limitation on punitive damages under the UTSA to twice the compensatory damages does not create an equivalency between an award of punitive damages under the UTSA and an award of treble damages under another statutory scheme. (For a listing of statutes

appellate review, since the appellate court cannot determine whether the award might bankrupt the defendant. Moreover, in the absence of evidence of the defendant's financial condition, the trier of fact is compelled to speculate as to the defendant's net worth in deciding what amount will appropriately punish. (54 Cal.3d at p. 112.)

More recently the courts have clarified that evidence of the defendant's annual income, standing alone, is not "meaningful evidence." (*Lara* v. *Cadag* (1993) 13 Cal.App.4th 1061, 1064 [16 Cal.Rptr.2d 811] (*Lara*).) Likewise, evidence of the profits wrongfully gained by the defendant is inadequate as it gives only the assets without the liabilities. (*Kenly* v. *Ukegawa* (1993) 16 Cal.App.4th 49, 56-57 [19 Cal.Rptr.2d 771]); but see *Cummings Medical Corp.* v. *Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1298-1301 [13 Cal.Rptr.2d 585].) What is required is evidence of the defendant's ability to pay the damage award. (*Lara*, at p. 1064.)

Here, there was no evidence of Mikesell's financial condition. Of course there was significant evidence of MBA's income from the Russian business and from other contracts wrongfully taken from RLCA, but as *Kenly* instructs, that evidence provides only one side of the financial picture. Boyak testified about the partnership's income and expenses from the Russian business, but there was no evidence of the partnership's other assets or liabilities, nor was there evidence of Mikesell's personal financial condition or net worth.

RLCA contends Mikesell should be estopped from complaining about the absence of evidence, as he declined to produce his financial records in response to RLCA's request for production of documents. Yet, there is no indication in the record that RLCA complained below about discovery noncompliance. At most, when Boyak testified on cross-examination that he had produced materials in response to RLCA's request for production of documents, counsel for RLCA commented that "there were no bank records

authorizing treble damages, see generally, 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1333, p. 791.) While an award of treble damages is equally punitive in its effect, the computation of the penalty is strictly mechanical. In contrast, an award of punitive damages under the UTSA is subject to no fixed standard; the statute merely sets a cap on the amount of the award. The trial court retains wide discretion to set the amount anywhere between zero and two times the actual loss. (§ 3426.3, subd. (c).) Thus, evidence of the defendant's financial condition remains essential for evaluating whether the amount of punitive damages actually awarded is appropriate.

in there."[9] Having failed to raise the point in the trial court, RLCA cannot do so for the first time on appeal.

Because the burden was on RLCA to present evidence of Mikesell's financial condition (*Adams, supra,* 54 Cal.3d at pp. 119-123), it was also incumbent on RLCA to show why that burden should be excused. In the absence of such a showing, we are compelled to conclude that the award of punitive damages cannot stand.

We recognize that the absence of evidence of Mikesell's financial condition was undoubtedly due to the fact that the issue of punitive damages was not put to the jury. Because we have concluded that the punitive damages award must be reversed, we do not reach the arguments of Mikesell concerning the absence of a jury finding on "willful and malicious misappropriation" and the authority of the trial court to make an independent award of punitive damages.

### III*

*Exclusion of Resignation Letter*

. . . . . . . . . . . . . . . . . . . . . . . . .

### IV

*Award of Expert Witness Fees*

██ Finally, appellant contends expert witness fees were erroneously allowed as costs. Pursuant to section 1033.5, subdivision (b)(1), of the Code of Civil Procedure, expert witness fees may not be recovered as costs "except when expressly authorized by law."[14] However, this court (Division Four) has held that when attorney fees are provided by contract and awarded pursuant to section 1717, then counsel's disbursements for expert witness fees are allowable as part of the attorney fee award. (*Bussey v. Affleck* (1990) 225 Cal.App.3d 1162, 1164-1166 [275 Cal.Rptr. 646] (*Bussey*).) The *Bussey*

---

[9] In closing argument, counsel for RLCA stated, "I asked Mr. Boyak to produce the books, records and bank statements which back up their claim that they're not making any money. He didn't . . . . He had to do that by law, and he didn't do it. . . . He put some figures on the board which were absolutely contrary to what's in evidence."

*See footnote 1, *ante,* page 1141.

[14] Expert witness fees are expressly allowed when the expert was court appointed (Code Civ. Proc., § 1033.5, subd. (a)(8)) or when the judgment was less favorable than a rejected settlement offer (Code Civ. Proc., § 998, subds. (c), (d)).

court reasoned that statutes permitting the parties to contract for payment of attorney fees and costs (§ 1717; Code Civ. Proc., § 1021) render disbursements for expert witness fees "authorized by law."

More recently, the Third District has criticized *Bussey* and declined to follow it. (*Ripley* v. *Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1624-1627 [28 Cal.Rptr.2d 878] (*Ripley*).) The *Ripley* court reasoned that attorney fees and expenses of litigation—whether termed costs or disbursements—are mutually exclusive; attorney fees do not include expenses. The court noted that while the Legislature has provided for recovery of contractual attorney fees as costs (§ 1717; Code Civ. Proc., § 1033.5, subd. (a)(10)(A)), it has not done so for expert witness fees (Code Civ. Proc., § 1033.5, subd. (b)(1)). *Ripley* held, therefore, that because expert witness fees are disallowed by statute they are not recoverable as costs.

In the present case the trial court awarded RLCA attorney fees and costs under section 1717 (in accordance with the attorney fee clause of the confidentiality agreement) and included RLCA's expert witness fees of $18,217 within the award of costs. The court felt compelled to follow *Bussey* and denied MBA's motion to tax costs.

Mikesell now urges this court to reject *Bussey* and to follow *Ripley*. His position is sound. For all the reasons stated in *Ripley*, the *Bussey* decision should not be followed. Instead, in light of the Legislature's express prohibition against inclusion of expert witness fees within a cost award (Code Civ. Proc., § 1033.5, subd. (b)(1)), we shall modify the judgment to delete the expert witness fees of $18,217.

### Disposition

The judgment is reversed insofar as it orders payment of royalties and awards punitive damages. In all other respects, the judgment is affirmed. The postjudgment order awarding costs is modified by deleting the expert witness fees of $18,217. Costs on appeal are awarded to appellant.

Jones, P. J., and Stevens, J., concurred.