[Nos. A097708, A097974, A098305. First Dist., Div. Four. Feb. 17, 2005.]

ERIC C. HSU et al., Plaintiffs and Appellants, v.
SEMICONDUCTOR SYSTEMS, INC., et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. A., B., C., D., and F.

## Counsel

Gray Cary Ware & Freidenrich, Richard I. Yankwich, Stanley J. Panikowski, Barry D. Roe, Andrew P. Valentine and Kathryn E. Karcher for Plaintiffs and Appellants.

Folger Levin & Kahn, Michael A. Kahn, Roger B. Mead, Michael F. Kelleher and Andrew J. Davis for Defendants and Appellants.

## Opinion

**SEPULVEDA, J.**—Employee shareholders of a closely held corporation transferred ownership of the shares of a former employee to themselves just before a merger that significantly increased the value of the corporate shares. The acquiring shareholders claimed they "purchased" the shares pursuant to an employee shareholder agreement entitling them to acquisition at book value. A jury found that any right to purchase shares at book value pursuant to the agreement was either held by the corporation alone, not the shareholders, or had elapsed before the alleged right was exercised.

The jury awarded the former employee $2.4 million in compensatory damages upon concluding that no contractual right to purchase the shares had existed, and that the transfer of shares occurred with nondisclosure of the pending merger. The jury returned a verdict finding breach of contract, intentional interference with prospective economic advantage, conversion, and violations of the California Corporations Code. Additionally, a bench trial following the jury's verdict determined that the corporation's management breached their fiduciary duty by withholding information from the former employee, who had remained a corporate shareholder. In addition to the compensatory damages award, the court awarded the former employee over $2 million in costs and attorney fees.

This appeal followed, along with a cross-appeal by the prevailing former employee who challenges an adverse summary adjudication of his punitive damages claim and seeks remand for trial on punitive damages alone. We reject most of the contentions on both the appeal and cross-appeal, and affirm the judgment except for modifications in the cost award and one statutory claim.

# I.

## FACTS

### A. *Corporate Formation.*

Defendant Semiconductor Systems, Inc. (SSI) built and sold equipment used in manufacturing computer semiconductor chips. SSI was formed in 1990 as an employee-owned, closely held corporation. Plaintiff Eric C. Hsu was a founder, officer, director, and the largest shareholder of SSI, eventually holding 20 percent ownership.[1] Defendants Michael L. Parodi, Jr., Gerald E. Masterson, and Douglas K. Amis were also founders, officers, directors, and major shareholders (collectively, management defendants).[2] Hsu was SSI's vice-president of sales and marketing; Parodi was initially vice-president of engineering and succeeded to the post of president and chairman of the board of directors; Masterson was vice-president of finance, chief financial officer (CFO), and secretary to the board; and Amis was vice president of human resources.

SSI was formed through a management buyout of an existing corporation. Management borrowed the purchase money and, in conjunction with that loan, Hsu pledged his SSI stock as security for repayment and delivered his share certificate to the lender. The security pledge agreement was also accompanied by a blank form assignment of all SSI shares Hsu might acquire, to be used by the lender if SSI defaulted on its loan. The pledge agreement provided that it would terminate upon repayment of the loan, and promised that the share certificate and stock assignment would then be returned to Hsu. The loan was repaid in less than two years, and the lender delivered the share certificates and stock assignments to SSI. However, SSI did not forward those share certificates to Hsu or the other shareholders, but retained them.

### B. *Employee Stock Purchase and Shareholder Agreement.*

Meanwhile, each of the shareholders had signed an "Employee Stock Purchase and Shareholder Agreement" (Agreement) upon formation of SSI

---

[1] Hsu's wife, Angie L. Hsu, consented to the stock purchase and is also a plaintiff. For convenience, Mr. Hsu alone is referred to as plaintiff because Ms. Hsu played no active role in the events at issue.

[2] SSI corporate shares were also held, in lesser amounts, by defendants Qui Van Nguyen, Michael E. Van De Ven, John Stephens, Louie C. Fredriksz, Richard T. Benventano, Steve G. Cruickshank, Richard K. Fey, Ronald L. Lindquist, and Melville H. Madden (collectively, nonmanagement defendants).

that restricted disposition of shares.[3] A shareholder could not sell his or her shares without first giving SSI an opportunity to purchase the shares itself or, failing such an election, giving the other shareholders an opportunity to purchase the shares. There is also a purchase right if the employee-shareholder leaves the company, although whether that right inures to the benefit of SSI alone, or to shareholders as well, is a point of contention. It is clear, however, that any right to purchase shares of a departing employee is a right, not an obligation. If the purchase right under the Agreement is not exercised, the departing employee may keep the shares.

The right to purchase is also strictly limited in time and commences upon "the cessation of [the share] Purchaser's employment." The corporation's right to purchase a departing employee's shares must be exercised within 60 days of cessation of employment or within 45 days after the corporation's receipt of the departing shareholder's written notice of cessation of employment, whichever is later. Assuming the shareholders have a right to purchase a departing employee's shares if the corporation does not opt to purchase, then the corporation has seven days after termination of its option to buy to notify the shareholders of the availability of the shares and the shareholders have seven days from their receipt of notice to elect a purchase. Shares purchased from a departing employee are bought at book value (the employee-shareholder's portion of undistributed corporate profits).

## C. *Hsu's Departure from SSI.*

Hsu left SSI in the summer of 1995. The exact date of Hsu's cessation of employment, which triggered the time-restricted right to buy Hsu's shares, is disputed. Defendants maintain that Hsu's cessation of employment coincided with his August 24, 1995 notice of resignation. Plaintiff Hsu maintains that his cessation of employment occurred when he left the company on July 28, 1995, for a so-called "leave of absence" that was, in reality, a termination.

At trial, Hsu testified that he was offered an executive position at KLA Instruments Corporation (KLA) in Taiwan, and advised Parodi and Amis, SSI's president and vice-president of human resources, of his decision to accept the position over lunch on June 29, 1995. Hsu told the SSI executives that he would like to take a leave of absence, rather than to resign immediately, to blunt the impact of his departure for the company's benefit. Hsu also

---

[3] The Agreement contains different provisions for vested and unvested shares, but vested shares alone are at issue here.

wanted leisure time with his family before relocating to Taiwan. However, Hsu testified at trial that he clearly told the SSI executives that he would not return to SSI after his leave of absence. Amis's journal entry for June 29, 1995, is corroborative, though more equivocal than Hsu's testimony. Amis wrote that Hsu informed SSI that Hsu "wants to take a L.O.A. and probably will not return to the company." Parodi conceded at trial that SSI management's expectation was that Hsu "would not return from the leave of absence."

The testimony of Hsu and Parodi is consistent in establishing that Parodi asked Hsu not to announce his leave of absence until after an important industry conference in mid-July 1995. Hsu agreed to limit his announcement to a few people, and told only CFO Masterson, certain SSI sales personnel, and a couple of customer contacts before the July 1995 conference. One of those SSI sales personnel, defendant Fey, corroborated the fact that Hsu announced to some members of the SSI sales staff before the July 1995 conference that Hsu was "leaving the company." Fey understood that Hsu "would not be returning as an employee."

Hsu testified that he made a general announcement to his sales and marketing department on July 13, 1995, the last day of the industry conference, that he was taking a leave of absence, at the completion of which he would not return to SSI but would instead work at KLA. Hsu completed a form request for leave of absence covering the period from July 28, 1995, to September 30, 1995, using dates Hsu said SSI's Amis told him to use. Hsu testified that he told SSI's human resources department, when completing the form, that he was taking a month's leave of absence and then would start work at KLA. Hsu's salary and medical insurance were terminated at the start of his leave of absence.

Hsu physically left SSI on Friday, July 28, 1995. Hsu testified that he packed and removed his personal belongings and returned his security badge. Hsu had planned to start work at KLA in September, after time off from work, but instead started at KLA on the following Monday, July 31, 1995. Hsu initially worked for KLA in the San Francisco Bay Area, and then split time between California and Taiwan.

The journal entries of SSI management following Hsu's physical departure indicate that management understood that Eric Hsu was not returning. Amis, the vice-president of human resources, may have begun efforts to replace Hsu

as vice-president of sales and marketing. Amis's journal entry on his task list for August 17, 1995, states: "Search of VP sales." On that same day, CFO Masterson's task list includes the notation: "Get Eric off Records."

On August 24, 1995, Hsu faxed notice of resignation to SSI's management, Parodi, Masterson, and Amis. Hsu wrote: "This memo is to inform you regarding my resignation, from the position of Vice President of Sales and Marketing at Semiconductor Systems Inc. start this date." Hsu testified that he sent the letter because he had told SSI that he was taking a month's leave of absence beginning July 28, 1995, and was writing about a month later "to have closure." SSI replied to Hsu on August 24, 1995, accepting his resignation "effective this date."

## D. *Failed Negotiations to Purchase Hsu's SSI Corporate Shares.*

When Hsu provided his notice of resignation on August 24, 1995, he also wrote to SSI management saying that he wanted to sell his SSI stock back to the company and requesting corporate financial documents to assess any purchase proposal. Hsu was not aware of any purchase rights under the Agreement. Hsu testified that SSI had previously purchased shares of departing employee-shareholders at what Hsu believed were freely negotiated prices. Hsu intended to keep his shares if he and SSI could not agree on a price.

SSI initially expressed no interest in purchasing Hsu's stock, and told him he should keep his shares. However, SSI agreed to get back to Hsu with a proposal, and did so on September 28, 1995. SSI's proposal did not invoke the Agreement, and offered a price below the Agreement's formula book value. SSI represented the book value of Hsu's shares at $1.86 million, and offered a maximum of $750,000 based on a liquidation value. As of this time, SSI had not made any mention of the Agreement, or its provisions for purchasing a departing employee-shareholder's stock.

In October 1995, Hsu told SSI's CFO Masterson that Hsu could not accept the proposal without supporting financial documentation as to the value of the shares, which Masterson agreed to provide. Hsu also told Masterson that Hsu intended to seek outside advice on valuing his shares. Shortly after Hsu's conversation with Masterson, SSI increased its offer to $1.8 million on October 27, 1995. In SSI's written offer, Masterson said he calculated the figure under the Agreement's "purchase price formula," but the amount would have to be paid over four years and payment was subject to approval by SSI's bank. This was SSI's first mention of the Agreement since Hsu's departure from the company.

Hsu and Masterson both testified that SSI was not attempting to invoke its rights under the Agreement at this time and that the parties were continuing their negotiations outside the Agreement. In fact, Masterson conceded at trial that any right that SSI had to purchase Hsu's shares under the Agreement had lapsed. SSI's right under the Agreement to buy Hsu's shares expired by October 23, 1995, at the latest, even assuming that Hsu ceased employment upon his written resignation on August 24, 1995, and not the earlier date of the designated leave of absence. Hsu did not accept SSI's October 27, 1995 offer, and continued to insist on reviewing the company's financial documents.

### E. *SSI Negotiates a Merger with Another Company.*

Meanwhile, SSI was exploring various financing alternatives to sustain growth. In late September 1995, FSI International, Inc. (FSI), expressed interest in the possibility of a financial transaction with SSI. On October 10, 1995, SSI hired an investment banking firm to evaluate its financing alternatives. FSI executives toured SSI facilities, and SSI and FSI signed a nondisclosure agreement for sharing corporate information, on November 1, 1995. SSI management (Parodi, Masterson, and Amis) toured FSI facilities on November 16 and 17, 1995, as discussions continued. The possibility of a merger was under consideration by November 1995. Draft merger agreements were circulated between SSI and FSI beginning in mid-December 1995, and SSI approved the merger on February 4, 1996. The merger agreement was signed February 5, 1996, and the transaction closed in April 1996. SSI shareholders realized a multimillion dollar profit.

### F. *SSI Shareholders Acquire Hsu's Shares.*

Parodi, Masterson, and Amis of SSI did not disclose to Hsu their discussions with FSI leading to the merger. In late October 1995, after FSI expressed an interest in discussing financial arrangements with SSI, SSI took a different approach in dealing with Hsu. Previously, SSI had proposed purchasing Hsu's shares outside the Agreement, at negotiated terms.

SSI now tried for a shareholder purchase under the Agreement. On October 30, 1995, SSI notified its shareholders (except Hsu) that limitations imposed by the company's bank could restrict SSI from purchasing Hsu's shares, and offered the shareholders an opportunity to buy Hsu's shares at book value. Parodi and Masterson informed the shareholders that SSI was investigating financial partnerships, and that investment representatives valued the company higher than its book value. In fact, written materials provided to the shareholders went so far as to say that the market value of Hsu's shares "far exceeds" the book value, and that a merger or other event "leading to at least partial liquidity" could occur in the next 12 months.

The shareholders were asked to make their purchase elections by November 3, 1995. The shareholders returned elections to purchase Hsu's shares dated between October 30 and November 3, 1995. Assuming the shareholders had a right to purchase a departing employee's shares (a disputed point), elections through November 3, 1995, would be timely only if Hsu ceased employment upon his written resignation on August 24, 1995, and not the earlier date of the designated leave of absence.

Masterson of SSI wrote to Hsu on November 3, 1995, stating that the shareholders were exercising their purported right under the Agreement to purchase Hsu's shares at book value, which Masterson said was $1.8 million—the same price offered by Masterson in his October 27, 1995 letter. Masterson asked Hsu to specify his payment instructions, and indicated a desire to close the transaction by November 20, 1995. Hsu telephoned Masterson on November 14, 1995, and again the next day, and advised Masterson that Hsu was still awaiting financial documentation supporting Masterson's proposal. Masterson did not mention his recent invocation of the Agreement, and Hsu believed discussions were still open as to the sale of his shares. Masterson and Hsu agreed to discuss the matter further by telephone on November 21, 1995. Instead of a telephone call continuing discussions, Masterson sent a letter to Hsu on November 21, 1995, stating that SSI shareholders were exercising their right to purchase Hsu's shares under the Agreement, and enclosing an SSI company check for $1,803,847. The letter was delivered on the same day that SSI delivered a "term sheet" to FSI proposing a merger valued at $57 million.

Hsu did not believe that there was any difference between SSI's October 27, 1995 offer and the shareholders' November 1995 stated elections to buy. Hsu thought he was still negotiating with the company through Masterson. Before receiving SSI's latest letter and check, Hsu replied to SSI on November 22, 1995, that he was agreeable to SSI's October 1995 proposal to use book value in valuing the stock but said he wanted an audit to ascertain that value. Upon receiving SSI's check, Hsu immediately objected that no agreement had been reached to sell his shares. Hsu said that Masterson's letter and check were "invalid." Hsu did not cash the check.

After tendering the check to Hsu, SSI transferred ownership of Hsu's shares to the remaining shareholders over Hsu's prior objection without his knowledge. Under the Agreement, any transfer between shareholders was supposed to be accomplished by the departing employee's voluntary acceptance of the formula purchase price and delivery of his or her share certificates. Rather than obtaining Hsu's endorsement of his stock certificate as required by the Agreement, SSI used a blank form stock assignment signed by Hsu in a previous, unrelated transaction. As noted earlier, Hsu had pledged

his SSI stock as security for repayment of a loan at the time of SSI's corporate formation. The security pledge agreement was accompanied by a blank form assignment of all SSI shares Hsu might acquire, to be used by the lender if SSI defaulted on its loan. The pledge agreement terminated years earlier upon repayment of the loan, and the stock assignment should have been returned to Hsu but was retained by SSI. It was that stock assignment document, executed by Hsu for the distinct purpose of securing a loan, that SSI used to transfer ownership of Hsu's shares to the remaining shareholders.

SSI never told Hsu that it had transferred ownership of his shares to the other shareholders. On December 21, 1995, SSI wrote to Hsu agreeing to an audit and consideration of a price adjustment of its $1.8 million book value calculation, but without indicating that the shares had already been transferred. Hsu told SSI that he would not accept their proffered check for the purchase of his shares until the audit was complete. The audit was being arranged when, in February 1996, SSI publicly announced a merger with FSI. Hsu testified at trial that no agreement to sell his shares had ever been reached.

## II.

## TRIAL PROCEEDINGS

Hsu sued SSI and the individual defendant shareholders in October 1996 for breach of contract, breach of fiduciary duty, violation of the California Corporations Code, and related claims. On cross-motions for summary adjudication on multiple issues in November 1998, the court found that defendants' reliance upon the advice of counsel negated plaintiff Hsu's punitive damages claim.

Jury trial commenced in September 2000. In October 2000, the jury returned a verdict in plaintiff Hsu's favor on all submitted claims: breach of contract, intentional interference with prospective economic advantage, conversion, and Corporations Code violations. The jury found that defendant SSI breached the Agreement either because the individual shareholder defendants had no right to purchase Hsu's shares or because the shareholders' right to purchase had expired before the elections to buy were submitted. The jury also found that the management defendants (Parodi, Masterson, and Amis) intentionally interfered with Hsu's prospective economic advantage, and that all defendants wrongfully converted Hsu's shares. Finally, the jury found SSI and the management defendants liable for buying stock through means of negligent misrepresentation in violation of Corporations Code section 25401, among other Corporations Code violations by SSI and certain management defendants. The jury assessed damages for the contract and torts claims at

$2.418 million, plus an additional sum later struck by the trial court for intentional interference with prospective economic advantage. The damages award appears founded upon the testimony of plaintiff Hsu's damages expert that the merger value of Hsu's shares was $4.218 million and he received only $1.8 million, for a difference of $2.418 million.[4]

In January 2001, the court held a bench trial on Hsu's equitable claims. After a tentative statement of decision and objections, the court issued its final statement of decision in November 2001. The court concluded that the management defendants (Parodi, Masterson, and Amis) breached fiduciary duties owed Hsu as a shareholder.

The court found that Hsu ceased employment with SSI on July 28, 1995, the date he started his purported leave of absence, but remained a shareholder until November 22, 1995, when SSI unilaterally transferred ownership of Hsu's shares. The court found that any right vested in the shareholders to buy Hsu's shares lapsed before the elections to buy were made. The management defendants' transfer of Hsu's shares in violation of the Agreement, and their failure to disclose material information to Hsu, breached fiduciary duties owed Hsu as a shareholder.

In January 2002, posttrial motions for a new trial or judgment notwithstanding the verdict were denied, with the exception of an adjustment to the damages awarded for intentional interference with prospective economic advantage noted earlier. An amended and final judgment was entered on March 8, 2002. In addition to the $2.418 million compensatory damages award, the court also awarded Hsu over $1 million in prejudgment interest and approximately $2.3 million in costs and attorney fees. The parties timely appealed.

### III.

### DISCUSSION

### A.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### E. *Costs.*

The trial court awarded plaintiff Hsu $136,824.98 in costs. The award includes $69,466.08 for expert witness fees and general photocopying expenses, which defendants contend are not recoverable as costs. Defendants

---

[4] The parties stipulated that Hsu eventually cashed SSI's tendered and refused $1.8 million check, without waiving his objections.

[*] See footnote, *ante*, page 1330.

are correct. These two categories of expenses are "not allowable as costs, except when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b)(1) & (3).)

■ Plaintiff argues that the expenses are expressly authorized by law because contractual fee and cost provisions are enforceable, and the parties' Agreement states that the prevailing party shall recover "all fees, costs and expenses." (See Civ. Code, § 1717, subd. (a).) Plaintiff argues that the broadly worded contractual cost provision expands the scope of recoverable costs beyond those costs permitted by statute. Some courts have rejected this argument outright, holding that the Legislature's intention that Civil Code section 1717 be uniformly applied precludes litigants from adopting a definition of costs different from the statutory definition. (E.g., *Fairchild v. Park* (2001) 90 Cal.App.4th 919, 928–930 [109 Cal.Rptr.2d 442].) Other courts have held that litigants may contractually define costs different from the statutory definition, although contractual costs provisions are presumed to adopt the statutory definition absent evidence to the contrary. (E.g., *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 491–492 [54 Cal.Rptr.2d 888] (*Arntz*).) As stated in *Arntz*, "an undefined general contractual provision entitling the prevailing party to 'reasonable attorney's fees and costs' must be interpreted in light of Code of Civil Procedure section 1033.5's limited definition of costs." (*Id.* at p. 491.) Nevertheless, "[w]hile it is reasonable to interpret a general contractual cost provision by reference to an established statutory definition of costs, we do not discern any legislative intent to prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses." (*Id.* at p. 492; see *Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436, 446–447, fn. 5 [71 Cal.Rptr.2d 452, 950 P.2d 567] [the effect of a contractual agreement for shifting litigation costs turns on the intentions of the parties].)

■ Plaintiff urges us to follow *Arntz*, and to construe the Agreement here as providing a standard of "costs" broader than the statutory definition. But the costs award is insupportable even if we were to do as plaintiff urges. Recovery of costs provided by contract must be specially pleaded and proven at trial, and not awarded posttrial as was done here. (*Arntz, supra,* 47 Cal.App.4th at p. 491; *First Nationwide Bank v. Mountain Cascade, Inc.* (2000) 77 Cal.App.4th 871, 878–879 [92 Cal.Rptr.2d 145].) "[T]he proper interpretation of a contractual agreement for shifting litigation costs is a question of fact that 'turns on the intentions of the contracting parties.' "

(*First Nationwide Bank, supra,* at p. 879.) Accordingly, "the issue must be submitted to the trier of fact for resolution pursuant to a prejudgment evidentiary proceeding, not a summary postjudgment motion." (*Ibid.*)

■ Nor may the disputed costs be awarded to plaintiff as an element of attorney fees under the rationale that the expenses were disbursed by the attorneys in the course of litigation. We disavow this court's previous adoption of that view as an unwarranted conflation of fees and costs. (*Bussey v. Affleck* (1990) 225 Cal.App.3d 1162, 1167 [275 Cal.Rptr. 646].) As persuasively argued by our colleagues in the Third Appellate District in disagreeing with *Bussey*: "In the absence of some specific provision of law otherwise, attorney fees and the expenses of litigation, whether termed costs, disbursements, outlays, or something else, are mutually exclusive, that is, attorney fees do not include such costs and costs do not include attorney fees." (*Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1626 [28 Cal.Rptr.2d 878].) We join other divisions of this district in following *Ripley* on this point. (*First Nationwide Bank v. Mountain Cascade, Inc., supra,* 77 Cal.App.4th at p. 878; *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1154 [82 Cal.Rptr.2d 143].)

■ Defendants also argue that $1,530.91 spent by plaintiff to expedite preparation of deposition transcripts is not recoverable as an item of costs. Standard transcription fees for "necessary" depositions are recoverable, but the extra cost for expediting transcripts may be allowed only in the exercise of the trial court's discretion. (Code Civ. Proc., § 1033.5, subds. (a)(3), (c)(4).) Plaintiff maintains that the trial court either found the extra deposition fees to be necessary or exercised its discretion in allowing recovery of these extra fees. Plaintiff notes that the court commented, at the hearing on costs: "I am not satisfied that [the expedited transcripts] are merely convenient." However, the court also said that the requested expedited deposition costs are "not allowed under the code section," and proceeded to award the costs under the parties' contract which, in the court's view, provided a more expansive definition of costs. The court erred in awarding costs not authorized by statute. We will therefore modify the judgment to strike the recovery of expert witness fees, general photocopying costs, and expedited deposition transcript fees, thus reducing the costs award by $70,996.99.

F. *Cross-Appeal: Punitive Damages.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 1330.

## IV.

## DISPOSITION

The judgment is modified to strike the finding that defendant SSI violated Corporations Code section 25401 and to reduce the costs award to $65,827.99. As modified, the judgment is affirmed. The parties shall bear their own costs and attorney fees incurred on the appeal and cross-appeal.

Kay, P. J., and Rivera, J., concurred.

A petition for a rehearing was denied March 17, 2005.