Filed 2/9/15  Union Central Cold Storage v. RDM Warehouse CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| UNION CENTRAL COLD STORAGE, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RDM WAREHOUSE et al., <br><br> Defendants and Respondents. | B244944 <br><br> (Los Angeles County <br> Super. Ct. No. BC452746) |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Affirmed in part and reversed in part.

Klapach & Klapach and Joseph S. Klapach for Plaintiffs and Appellants.

Vanek, Vickers & Masini and Jon B. Masini (admitted pro hac vice); Foran Glennon Palandech Ponzi & Rudloff, Keith E. Butler and Ciprian Dogaru for Defendants and Respondents.

_____

Union Central Cold Storage Inc. (Union Central) appeals from the judgment entered upon jury verdicts in favor of respondents RDM Warehouse, RDM International (collectively RDM) on RDM's cross-complaint against Union Central alleging, *inter alia,* causes of action for intentional interference with contractual relations, conversion, unjust enrichment and an award of punitive damages arising out of an agreement between RDM and Union Central for RDM to use storage space at a Union Central food storage warehouse. Union Central asserts several errors on appeal. Specifically it claims that: (1) the punitive damage award must be reversed because RDM failed to present meaningful, relevant evidence of Union Central's financial condition; (2) the tort claims cannot stand because Union Central was merely seeking to enforce its rights under the warehouse agreement it had with RDM; and (3) the judgment on the unjust enrichment claim must be reversed because unjust enrichment is not a separate cause of action, but instead is a remedy. As we shall explain, only the punitive damage award warrants reversal. Accordingly, we reverse the award of punitive damages and affirm in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Parties*

At the time relevant to this litigation, Union Central operated a cold storage and warehousing business. The business was incorporated in 1984 and is owned and operated by Fred and Gaynel Rader. Their daughter, Courtney Daily, is controller of the company. Union Central operated from two warehouse facilities in the Los Angeles area – one located on Industrial Street, and the other located in Huntington Park. According to Mr. Rader, Union Central leased the warehouses and did not have any ownership interest in either facility. The Industrial Street warehouse contains 1.6 million cubic feet of dry, cold, and frozen storage.

Respondents RDM International buys and sells food products, and RDM Warehouse is a storage company that provides warehouse services. RDM does not own a warehouse facility. Robert Moore was president of RDM Warehouse and RDM

2

International.  RDM did not own its own building, and at the time the parties were introduced, Mr. Moore was interested in buying one of Union Central's buildings.

## 2. *The Agreement Between the Parties*

In February 2010, Moore contacted Mr. Rader to inquire about renting space in one of Union Central's warehouse facilities for a short term.  On February 11, 2010, Moore, the Raders and Ms. Daily met for two hours at the Industrial Street facility for a tour and to discuss the proposal.[1]  RDM and Union Central subsequently agreed that RDM would rent storage space in the facility.

The disagreement at issue in the litigation centers on the type of agreement that the parties subsequently entered and the conduct of the parties after the relationship between them broke down.  During the trial, RDM presented evidence from an expert in the warehousing industry who explained that two types of contracts are used in the warehousing business – lease agreements and warehouse storage contracts.  The expert explained that under a lease agreement the tenant uses its own staff and its own equipment at the warehouse site.  The tenant under a lease handles its own product, including loading and unloading of delivery trucks and placing the product in the warehouse.  In contrast, under a warehouse storage contract, the party renting the space has its product delivered to the warehouse and then the warehouse owner's staff unloads, handles and stores the product using the warehouse equipment.  By virtue of the different responsibilities and duties of the parties under the two agreements, the rights that inure to the parties under each contract are different.

**RDM's Version – Lease Agreement.**  According to RDM, at the end of the meeting on February 11, 2010, Moore and Mr. Rader signed a lease document, dated February 11, 2010, entitled "Issues for Lease Agreement."  Ms. Daily also signed the document as a witness.  Mr. Rader and Mr. Moore initialed every term in the document.  Under the "agreement," RDM was to pay $28,000 a month for rent and utilities for use of

---

[1]     The Raders recorded the meeting on videotape.

3

the facility. The agreement did not provide a specified term for the agreement, but did specify and assign various responsibilities to both RDM and Union Central. Under "Our Responsibilities," Union Central agreed to provide: storage space at a specified temperature, alarm service, water, sewer, electrical service (at $8,000 a month), office space, use of the bathroom (and limited bathroom supplies), use of a common dock area and concourse area. RDM also assumed various responsibilities under a section titled: "Tenants."

According to the transcript from the recorded meeting, Mr. Rader agreed to prepare a draft of the agreement according to the terms they had agreed upon, then he and Moore would sit down and go over it. Thereafter, Moore would consult with his attorney and Mr. Rader would take the draft to his lawyer, who would formalize the document into a lease. Mr. Moore was also told by the Raders that RDM could begin moving in the next day.

The "Issues for Lease Agreement" was never formalized into a written agreement as the parties had discussed at the meeting. Nonetheless, RDM moved into the warehouse space in mid-February 2010. After RDM occupied the warehouse space, it maintained its own office space in the warehouse, used its own employees, forklifts, and equipment, and handled all of its customers' products.

Ms. Daily testified that the difference between a regular warehouse customer and a lease customer is that for a regular warehouse customer, Union Central typically performs full services and they do "everything" for the customer. During subsequent interaction among Mr. Rader, Mr. Moore, and Ms. Daily, they referred to RDM as the "tenant," Union Central as the "landlord" and referenced the "lease" between the parties and the amount of "rent" to be paid by RDM.

At trial, RDM's warehouse expert expressed the opinion based on his experience in the industry that the parties had entered into a lease agreement. The expert testified that notwithstanding any written contract, based upon the conduct of the parties, the

relationship between the parties was a lease arrangement and, therefore, Union Central did not possess any lien rights.

**Union Central's Version – Warehouse Agreement.** According to Union Central, RDM made arrangements to move its product into Union Central's facility starting February 20, 2010, even though the lease discussed at the February 11, 2010 meeting had not yet been formalized. According to Ms. Daily, she became concerned about allowing RDM to move into the facilities without the documentation in place. Ms. Daily suggested to her parents that RDM become a warehouse customer under a warehouse agreement, rather than a tenant under a lease agreement. Ms. Daily testified that she then told Mr. Moore "Bob, you gotta become a warehouse customer." Mr. Moore denied having any conversation with Ms. Daily about changing from the lease agreement he had just signed to any other type of agreement. Mr. Moore denied that Mr. Rader called him and told him he had to become a warehouse customer.

On February 16, 2010, Ms. Daily sent an email to Mr. Moore enclosing Union Central's standard form application and warehouse agreement, along with a W-9 form. Ms. Daily explained: "Here are a couple things that I need to get filled out. Please have them filled out and either emailed back to me or faxed to me
. . . ." The subject line of the e-mail states: "Application and W-9." Ms. Daily's e-mail attaching the documents did not indicate that one of the documents was the warehouse contract and did not mention any terms and conditions were being added to the agreement. She further testified that, in her view, the subject line "Application/W-9" was supposed to advise Mr. Moore that she was attaching a new contract. According to Ms. Daily, the purpose of having Mr. Moore fill out the "application" and sign the terms and conditions, was, in part, that she felt RDM becoming a warehouse customer gave her parents more protection than a lease agreement. Ms. Daily also believed that as an experienced warehouseman, Mr. Moore would be familiar with warehouse agreements. The proposed warehouse agreement was entitled, "Union Central Cold Storage – Contract Terms and Conditions." Among other things, it provided that "[e]xcept where is

5

otherwise described by law[,] the warehouseman may notify the bailler or other owner of the goods to be removed by the end of the next succeeding month. If the bailler does not remove such items then the warehouseman may sell said items in accordance with the law." It further provided that "[i]f for some reason the [warehouse] fees are not paid the warehouseman will have a lien on such goods. If bill is not paid after 30 days, goods will be sold to pay for charges incurred."

Later that day on February 16, 2010, Mr. Moore responded to Ms. Daily's email with the promise that "I will get this filled out for you." Mr. Moore completed the documents and sent them by facsimile to Union Central the same day they were sent to him. At trial, Mr. Moore testified that although he signed the warehouse agreement, he did not read it and did not intend to agree to its terms. Mr. Moore stated he did not read the W-9 tax form or the one page of pre-printed terms and conditions before signing them because he believed RDM and Union Central already had a lease agreement in place. Mr. Moore never spoke with Ms. Daily or Mr. Rader about the warehouse agreement, either before or after he signed and returned it.[2]

Thereafter, on February 21, 2010, in the email to Mr. Rader, Ms. Daily wrote, "you told me he was going to be a warehouse customer and not a lease tenant anymore. If I'm confused about this issue then I imagine that Bob is confused." Thereafter, in another email dated February 21, Ms. Daily wrote, "Fred, Bob [Mr. Moore] was unaware of the new agreement." Ms. Daily urged Mr. Rader to clarify the situation and suggested that Mr. Moore should be given keys and alarm codes only if a formal agreement was

---

[2]      The document signed by Mr. Moore did not contain any other contract terms and conditions, including, inter alia, the amount to be paid, size of storage space, what product RDM would be storing, who was responsible for payment of utilities, what temperatures were required or RDM having its own office space within the warehouse. In addition, there is nothing in the one-page document that indicates that it somehow replaces the prior lease agreement. The warehousing expert testified at trial, based upon his review of the one-page document signed by Mr. Moore, that document was not a warehouse contract.

prepared.  In response, Mr. Rader explained that "warehouse laws . . . are much easier to enforce," and that he had decided that the parties would proceed under the signed warehouse agreement, rather than through "a lease program."

### 3. *Break Down of the Relationship*

From late February 2010 through September 2010, RDM used Union Central's facilities and paid the monthly storage fees and charges.  RDM was provided with office space at the facility and used its own employees, tools, and equipment to load and unload its customers' products.

In early October 2010, a rainstorm caused water to leak into RDM's office space at the Union Central's facility.  The water caused damage to some of RDM's office equipment.  Mr. Moore and Mrs. Rader argued about the leak and the damage.  As a result, Mr. Rader sent an email to Moore advising him, "the agreement was never to be long term," and that "I need you to start planning today to move out of your 2000 pallet usage no later than through November 18th."  On October 18, 2010, Mr. Rader sent Moore a letter, explaining that "[m]y previous email was a notification to terminate our storage agreement," and that "[t]his letter should be a second notification that I do not want RDM employees on the property after 11/18/10 . . . ."  In early November, Moore sent Union Central a letter responding to Mr. Rader's correspondence.  Moore asserted that Union Central had breached the contract with RDM in various ways, including by restricting access to the facility, by failing to pay for damaged office equipment, and by subjecting RDM's employees to unsafe working conditions.  The letter included a number of demands and concluded that the date to vacate the premises "should be moved to December  21, 2010."  After efforts to settle the issues between the parties with the help of a lawyer proved unsuccessful, on November 20, 2010, Union Central served RDM with a three-day notice to vacate the premises.  Mr. Rader conceded at trial that it would not have been possible for RDM to remove everything from the warehouse during that three-day period.  RDM did not pay any storage fees or charges incurred after November 18, 2010.

On November 24, 2010, at the direction of Mr. Rader, his employees took various actions to make it more difficult for RDM to receive deliveries at the warehouse as well as remove its product from the warehouse. For example, Union Central employees parked forklifts behind RDM's trucks. RDM indicated that it would vacate the warehouse by December 5, 2010, and made efforts to remove its product from the facility. When RDM employees arrived on December 6, 2010, to continue to remove items from the facility, they were not permitted to enter. Union Central informed RDM that if RDM did not pay $40,000, Union Central would hold the property and sell it. Union Central indicated that it intended to impose a lien on the remaining goods in the warehouse for unpaid warehouse charges and to sell those goods in order to pay for those charges.

In the weeks that followed, RDM made additional attempts to remove items from Union Central's warehouse, but were advised by Mr. Rader that nothing could be removed. On a few occasions, Union Central allowed some of the product to be released to a few of RDM's customers, but Union Central would not allow anyone other than Union Central employees on the premises to choose the particular item.[3] Other requests by RDM on behalf of its customers were refused. Mr. Rader admitted at trial that in situations where RDM had indicated they had a particular client who wanted particular product, Mr. Rader knew that he was preventing RDM from getting products to its customer.

In the months that followed, Union Central sold a number of the products that it had retained (from RDM) and kept the proceeds of the sales. Union Central also agreed to release frozen Cuban lobster to the United States Government for payment of $9,840 in unpaid storage fees. Union Central also held lien auctions for the goods. At the time

---

[3] Mr. Rader instructed his employees to just go in the warehouse and grab the first RDM pallet they saw, to take it out and put it in the truck.

8

of trial, Union Central still had some of RDM's product consisting of 7,000 cases of mangoes, 1,000 cases of crab, and four or five pallets of juice and peaches.

### 4. The Litigation

On January 10, 2011, Union Central filed a complaint against RDM Warehouse, RDM International, and Robert Moore for breach of contract and open book account.[4] The complaint alleged that RDM had breached the February 16, 2010, warehouse agreement by failing to pay Union Central's invoices.

In September 2011, RDM Warehouse and RDM International filed a cross-complaint against Union Central asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with contract and prospective economic advantage, conversion, unfair business practices, fraud, and unjust enrichment. RDM sought compensatory and punitive damages. The cross-complaint alleged that Union Central breached a February 11, 2010, lease agreement by failing to maintain the premises and by refusing to allow RDM access to the property. The cross-complaint further alleged that Union Central interfered with RDM's business and wrongfully converted RDM's property by taking possession of RDM's products and by refusing to allow RDM to remove them.

In its pleadings and at trial, Union Central proceeded on the theory that the warehouse agreement governed the relationship of the parties. Union Central asserted that the warehouse agreement afforded it lien rights in the products at its facility and allowed it to seize the property and sell it to pay for unpaid storage fees. For its part, RDM contended that it was a tenant under the lease agreement. Union Central was, therefore, required to initiate a legal process before it could evict RDM and had no lien rights with respect to the products that were stored at Union Central's facility.

Shortly before trial, RDM informed the trial court that it wished to amend its

---

[4] Mrs. Rader also filed an individual claim for assault and battery against Mr. Moore arising from their argument about the roof leak. However, she dismissed that claim prior to trial.

cross-complaint against Union Central to allege claims against Fred Rader and Gaynel Rader under an alter ego theory. The trial court advised the parties that it was too late to add new parties. RDM proceeded to trial on the cross-complaint solely against Union Central, as originally pleaded.

In July 2012, the trial court conducted a nine-day jury trial. On July 31, 2012, the jury rendered special verdicts rejecting all but two of the claims asserted in the complaint and cross-complaint. With respect to Union Central's complaint, the jury found that, although Union Central and RDM entered into a contract, Union Central could not recover for breach of contract because it did not substantially perform its own obligations under the contract and was not excused from performance. Similarly, on RDM's contract claim, the jury found that a contract existed between the parties, but that RDM had failed to perform its obligations under the contract and was not excused from doing so. The jury was not asked to decide which of the version of the contract—the warehouse agreement or the lease agreement—was the operative contract.

In addition to rejecting RDM's breach of contract claim, the jury rejected RDM's claims for breach of the covenant of good faith and fair dealing, intentional interference with prospective economic advantage, intentional misrepresentation, concealment, and false promise. The jury entered a verdict in favor of RDM on its intentional interference with contractual relations and conversion claims. The jury found that RDM had a contract with three of its customers, Union Central knew of these contracts, and intended to disrupt the performance of these contracts. The jury also found that RDM had a right to possess the products stored in Union Central's warehouse, and that Union Central interfered with RDM's property by taking possession, preventing access, or refusing to return that property. The jury awarded a total of $335,066.73 in damages on these claims. The jury also found that RDM was entitled to recover punitive damages from Union Central. Thereafter the trial court conducted a brief trial on the amount of punitive damages. The jury awarded $275,000 for RDM against Union Central in punitive damages.

10

In August 2012, Union Central filed a motion for a new trial, challenging the award of punitive damages. On October 5, 2012, the trial court denied the motion for a new trial.

On October 18, 2012, Union Central filed for bankruptcy under Chapter 11 of the United States Code. The next day, Union Central filed a notice of stay in this action.[5] Thereafter, Union Central filed a timely notice of appeal.

## DISCUSSION

### I.     The Punitive Damage Award

Union Central argues that the punitive damage award must be reversed because RDM offered no meaningful evidence of Union Central's financial condition; that the award was excessive in light of the evidence of Union Central's financial situation and the evidence presented relating to Mr. and Mrs. Rader's personal financial situation was highly prejudicial. As we shall explain, we agree.

#### A.     Background

In the liability phase of the trial, the jury found that RDM was entitled to punitive damages based on Union Central's conduct. After the jury rendered the verdict, the trial court conducted a second phase of the trial to determine the amount of punitive damages.

Before the second phase of the trial, Union Central produced its financial records to RDM, as well as deeds for the two facilities operated by Union Central. The deeds reflected that the facility on Industrial Street was owned by the Raders, and the second building was owned by a separate entity called 6700 Alameda HPCA, LLC. Union

---

[5]     By letter brief, the parties have informed this court the bankruptcy proceedings have now concluded, and the automatic stay has been terminated. We have granted judicial notice of the documents from the bankruptcy court file attached to Union Central's letter brief. The parties agree that nothing that occurred in the bankruptcy proceedings, or that is contained in the bankruptcy reorganization plan operates to moot this appeal.

11

Central's interest in the two buildings was based on the facts that it had a lease to operate its warehouse business at those two buildings.

Prior to the start of the punitive damages phase, Union Central asked the court to exclude evidence relating to the ownership and value of the two buildings because they were not owned by Union Central. Union Central argued that "[n]either property is owned by Union Central," and that the jury's verdict "is against Union Central . . . , and it's not against Fred and Gaynel Rader, and it's not against the LLC." In Union Central's view, admitting evidence of the value of the buildings would be "irrelevant and extremely prejudicial" because it would suggest that the jury was "entitled to look at those properties [in determining] the value that Union Central may hold." In response, RDM's counsel argued that the evidence should be admitted because "it's clear that there's an alter-ego theory here to be pursued."

The trial court ruled that "it's incumbent upon me to give the defendants an opportunity to explore it."

The record of the punitive damages phase of the trial consists of only 15 pages of transcript. Over Union Central's objection, the trial court permitted RDM to introduce testimony from Mr. Rader that the Industrial Street building was currently being offered for sale for $8.5 million, and that the Huntington Park building was currently being offered for sale for $13.5 million. The jury was also informed that Union Central had no ownership interest in the property. RDM introduced testimony that Mr. Rader was the sole shareholder and president of a separate company called Union Central Properties, which owned equipment (valued at less than $500,000) at the Industrial Street building; and was also the sole shareholder and president of a separate company called Central Los Angeles Trading, Inc. RDM was also permitted to introduce testimony from Mr. Rader concerning the value of Union Central Properties, the value of Central Los Angeles Trading, Inc., and the value of the equipment owned by Union Central Properties. RDM introduced evidence that Fred and Gaynel Rader were the sole shareholders of Union

12

Central, and that the corporate records listed Mr. Rader as the registered agent of Union Central.

RDM did not introduce any records or documentary evidence of Union Central's financial condition. The only evidence about Union Central's financial condition came from Ms. Daily, who testified that "we haven't been doing very well," and that Union Central did not show a profit in 2010, 2011, or 2012.

After trial, Union Central renewed its objection to the trial court's decision to allow testimony about Fred and Gaynel Rader's financial condition. Thereafter, the trial court instructed the jury: "The party that you may award punitive damage[s] against, if you so choose, is Union Central Cold Storage, Incorporated only. You, therefore, may not consider evidence concerning the financial condition of any other entity other than Union Cold Storage, Incorporated. It is only the financial condition of Union Cold Storage, Incorporated which you are to consider." The jury awarded $275,000 in punitive damages against Union Central.

### A. Governing Law

"In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' (Civ. Code, § 3294, subd. (a).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712.) In reviewing a challenge to an award of punitive damages, courts traditionally "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109-110.) To make this determination, courts consider three factors: (1) the degree of reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded; and (3) the defendant's financial condition or wealth. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18.)

13

Union Central does not raise any issue on appeal with respect to the evidence of its conduct or the relationship between the amount of the damages awarded on the tort claims and the award of punitive damages. It challenges only the evidentiary showing regarding its financial condition.

"We review the trial court's award of punitive damages for substantial evidence." (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679.) A punitive damages award cannot be sustained absent meaningful evidence of the defendant's financial condition. (*Adams v. Murakami, supra,* 54 Cal.3d at p. 109; *Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680.) Indeed, "[b]ecause the important question is whether the punitive damages will have the deterrent effect without being excessive, an award that is reasonable in light of the first two factors, reprehensibility of the defendant's conduct and injury to the victims, may nevertheless 'be so disproportionate to the defendant's ability to pay that the award is excessive' for that reason alone. [Citation.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 620.) The plaintiff has the burden of presenting evidence and the burden of proof regarding the defendant's financial condition. (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 123; *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 83, fn. 9.) As hereafter stated, it is well established in the law that the purpose of punitive damages is to deter and not to destroy.

The evaluation of a defendant's financial condition must be considered in light of the purposes of punitive damages: to punish the defendant and deter the commission of wrongful acts. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928, fn. 13.) These policies are not served if the defendant's wealth allows him to absorb the award with little or no discomfort. (*Id.* at p. 928.) The "'wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective.' [Citation.]" (*Adams v. Murakami*, *supra,* 54 Cal.3d at p. 110.) Conversely, "'the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to

14

properly punish and deter.'" (*Ibid.;* see also *Rufo v. Simpson, supra,* 86 Cal.App.4th at p. 620.)

There is no established method or standard for determining a defendant's financial condition when evaluating an award of punitive damages. (*Bankhead v. ArvinMeritor, Inc., supra,* 205 Cal.App.4th at p. 79.) Although the defendant's net worth is commonly used in assessing punitive damages, it is not the exclusive measure. (*Rufo v. Simpson, supra*, 86 Cal.App.4th at p. 621; *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582; see *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fn. 3 [net worth too easily manipulated to be the sole standard for ability to pay].) Moreover, absent other measures of ability to pay, evidence of profits wrongfully obtained by the defendant is also inadequate. (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.) To obtain a meaningful understanding of the defendant's wealth, evidence of liabilities should normally "accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57.) Ultimately, "'[w]hat is required is evidence of the defendant's ability to pay the damage award.'" (*Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 680; see also *Adams v. Murakami, supra,* 54 Cal.3d at p. 112.) In addition, the defendant's wealth is to be measured as of the time of the trial on punitive damages. (*Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777; *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839.)

B.      *Analysis of Punitive Damages Evidence and Award*

In our view, RDM did not carry its burden to prove Union Central's financial condition during the trial. The evidence in the record is insufficient to demonstrate Union Central's overall ability to pay the punitive damage award. Although the substantial evidence standard is deferential to the fact finder, "this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . '[I]f the word "substantial" [is to mean] anything at all, it clearly implies

15

that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value. . . .' [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

The problem with RDM's evidence of Union Central's financial condition is several fold. Preliminarily, the evidence presented was non-specific and of little or no relevance to the punitive damage determination. RDM presented evidence that the two warehouse facilities that Union Central operated were listed for sale and elicited testimony from Mr. Rader as to the listing price. This evidence, however, was not probative on the issue of Union Central's financial condition because RDM did not demonstrate that Union Central had an ownership interest in those facilities. Likewise, RDM presented evidence about the value of the equipment in the facilities, but again, RDM did not present any evidence that the equipment was owned by Union Central. The Raders or other holding companies owned most of the assets Union Central used in connection with Union Central's business. Evidence of the financial condition of non-parties, such as the Raders, does not constitute "meaningful" evidence of Union Central's condition. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1283 [evidence in the financial statements relating to parent company not relevant to prove financial condition of party subsidiary].)

RDM presented no relevant evidence pertaining to Union Central's assets, income or net worth. RDM presented no evidence revealing Union Central's liabilities. Although it appears that Union Central produced financial records to RDM, RDM did not introduce any evidence from those records during the punitive damages phase of the trial. Finally, although Ms. Daily's testimony that Union Central did not show a "profit" from 2010 through 2012 and that Union Central had not "been doing very well," was relevant to Union Central's financial condition, the testimony was so ambiguous it provided little insight into Union Central's ability to pay a punitive damages award.

16

In short, even viewing the record in the light most favorable to the judgment, there was insufficient evidence from which the trier of fact—or this court on appeal—could determine whether Union Central could afford the award of $275,000 in punitive damages at the time of trial. (See, e.g., *Baxter v. Peterson, supra,* 150 Cal.App.4th at p. 681 ["In sum, although the record shows that [defendant] owns substantial assets, it is silent with respect to her liabilities. The record is thus insufficient for a reviewing court to evaluate [defendant's] ability to pay $75,000 in punitive damages."]; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 917 ["[W]ithout any evidence [defendant] still held the assets, or of the amounts of his liabilities, the $75,000 award is unsupported by substantial evidence and excessive."].) "Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive." (*Adams v. Murakami, supra*, 54 Cal.3d at p. 112.)[6]

Finally, because our reversal is based solely on insufficiency of the evidence, we conclude that we must strike the punitive damages award from the judgment, and that no retrial of the punitive damages issue is warranted. "'When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper. . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested.' (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661; accord, *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 626-627.) In another context, our Supreme Court explained in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 214, that '[f]or our justice system to function, it is necessary that litigants assume

---

[6] In view of our conclusion here, we do not reach the other arguments that Union Central has made with respect to the punitive damages award.

responsibility for the complete litigation of their cause during the proceedings.'" (*Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919.)

Here, as in *Baxter v. Peterson supra,* 150 Cal.App.4th at page 681, RDM had "'a full and fair opportunity to present [its] case for punitive damages, and [RDM] does not contend otherwise.' When a punitive damage award is reversed based on the insufficiency of the evidence, no retrial of the issue is required." (*Ibid.,* citing *Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919.) Likewise in *Robert L. Cloud & Associates, Inc. v. Mikesell, supra,* 69 Cal.App.4th at page 1154, the court reversed a punitive damages award because there was no evidence of the defendant's financial condition, and it did not remand for retrial. In view of this case law, we reverse the punitive damages from the judgment without ordering retrial.

## II. The Intentional Interference With Contractual Relations and Conversion Claims.

Union Central argues that this court should reverse the judgment for RDM on the tort claims because in acting to prevent RDM from removing its product from the warehouse and in denying RDM (and its customers) access to the facility, Union Central was only seeking to enforce its rights under the warehouse agreement, and as a result Union Central cannot be held liable for intentional interference with contract and conversion. Union Central's argument is not well taken.

In making this argument, Union Central relies on case law that articulates the principle that a party cannot be held liable for taking steps to enforce a contract, even if those steps cause the other party to the contract to breach a contract with a third party. (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 37*;* see *Webber v. Inland Empire Investments* (1999) 74 Cal.App.4th 884, 902.) This principle assumes, however, that the party seeking to vindicate its contract rights has a valid contract to enforce. Therefore, to prevail on this argument, Union Central has to demonstrate that the jury found the agreement between it and RDM gave Union Central the right to take the otherwise

18

tortious actions at issue and that Union Central performed under the contract or was excused from its performance.

At trial the parties presented two competing versions of the agreement governing their relationship: Union Central's version which gave it certain rights that may have permitted it to act in the way that it did; and RDM's version which, according to RDM's warehouse expert, would not have allowed Union Central's conduct. Although the jury found that Union Central and RDM had a "contract," the jury was not asked to decide which version of the contract governed the parties' relationship. Union Central has not demonstrated that its version is the one that the jury accepted. On the contrary, the fact the jury found that Union Central's conduct was tortious suggests the jury implicitly concluded RDM's version of the contract governed the relationship.

In addition, the verdicts on the contract cause of action also indicate the jury found that Union Central did not perform its obligations under the contract and was not excused from doing so. In our view, Union Central's failure to fulfill its contract obligations further undermines its reliance on the contract as a defense to the tort claims. Given the evidence on this issue presented at trial, and given that on appeal Union Central has not challenged the jury's findings on the contract claims, Union Central has not convinced us that the judgment for RDM on the tort causes of action must be reversed because Union Central was acting in accord with its contract rights.

In the alternative, Union Central argues that even if it did not have a valid contract with RDM, its actions taken in "good faith" to enforce what it believed were its contract rights, insulates it from tort liability. This argument is not persuasive.

Union Central's "good faith" argument is flawed because the jury found that Union Central acted in bad faith in connection with the tort claims when it awarded RDM punitive damages. As discussed elsewhere, although Union Central challenged punitive damages on appeal based on the argument that the amount of the award was not supported by meaningful evidence, Union Central did not assail RDM's entitlement to the award. Indeed, Union Central does not challenge the jury's implied finding that it

19

acted with malice, oppression or fraud in connection with the tort claims. The evidence that Union Central acted in bad faith in preventing RDM from accessing the facility, from removing items, from meeting RDM's contract obligations with its customers, and Union Central's conduct in reselling RDM's product, effectively subverts any persuasive argument that Union Central's actions, even if not authorized by contract, were justified because it acted in good faith.

In view of the foregoing, we conclude that Union Central has not demonstrated reversible error with respect to the judgment on the tort claims.

## III.    The Unjust Enrichment Claim

After the jury's verdict, the trial court considered RDM's equitable claims against Union Central. The trial court denied any relief under the unfair competition claims, but entered judgment in favor of RDM on its claim for unjust enrichment in the amount of $230,886.73, which represented the value of the RDM's products that Union Central withheld and sold. The trial court noted that "there has been a question about whether it [unjust enrichment] is a remedy or a cause of action." The trial court ultimately concluded that the case law "does recognize a cause of action for unjust enrichment." The court also stated that the amount awarded on the claim would not increase the overall amount awarded in connection with the tort claims.

Union Central argues the judgment for RDM on its claim for unjust enrichment must be reversed because unjust enrichment is not an independent cause of action under California law, and that instead unjust enrichment is a "remedy" that may be given in connection with another cause of action. RDM responds that Union Central waived its right to appeal the award; that unjust enrichment is a cause of action under California law, and that any error is harmless.

We do not reach the merits of Union Central's argument on this issue. Even were we to assume that Union Central preserved its claims for appeal and that its arguments are meritorious, any errors asserted are harmless. The amount of damages awarded on tort claims (i.e., conversion and interference with contractual relations) and the unjust

20

enrichment claim coincided.  The unjust enrichment award did not serve to increase the amount of total damages awarded to RDM in the judgment.  Consequently, the findings on the tort claims are sufficient standing alone to support the judgment for damages without reference to the other causes of action.  Thus, it is not reasonably probable that in the absence of the judgment on the unjust enrichment claim, a different result would have been reached in the trial court.

### *DISPOSITION*

The judgment is reversed as to the punitive damages award.  In all other respects, the judgment is affirmed.  Each party is to bear its own costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**